## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **CLARENCE MACKEY** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:18-cv 03271** |
| | § | **Jury Demanded** |
| **BANK OF AMERICA, N.A.** | § | |
| | § | |
| *Defendant* | § | |

---

### DEFENDANT BANK OF AMERICA, N.A.'S
### REPLY BRIEF IN SUPPORT OF FIRST AMENDED MOTION FOR
### SUMMARY JUDGMENT

---

Respectfully submitted,

**WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP**

By:   <u>/s/ Garett A. Willig</u>
       Garett A. Willig
       State Bar No. 24066297
       Federal Bar No. 1031029
       <u>garett.willig@wilsonelser.com</u>
       909 Fannin Street, Suite 3300
       Houston, Texas 77010
       713.353.2000 (Telephone)
       713.785.7780 (Fax)

       **ATTORNEY-IN-CHARGE FOR
       DEFENDANT BANK OF
       AMERICA, N.A.**

## CERTIFICATE OF CONFERENCE

Pursuant to Section 6E, Discovery and Scheduling Disputes of Judge Hanks' Court Procedures, and following a motion practice dispute between Plaintiff Clarence Mackey and Defendant Bank of America, N.A., a teleconference regarding the filing of this motion and the relief sought herein was held on April 1, 2020. During this conference, Plaintiff confirmed to the Court his opposition to this motion. The Court established a soft deadline of April 8, 2020 for Defendant to file this motion, but Defendant was not able to do so until today, April 10, 2020 and requested an extension from the Court to do so. Plaintiff is unopposed to the filing of the motion on April 10, 2020 rather than April 8, 2020, but remains opposed to the motion in all other respects. Plaintiff filed his Response on April 27, 2020.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all known counsel of record in accordance with the Texas Rules of Civil Procedure on this 11th day of May, 2020.

John P. Venzke
**THE VENZKE LAW FIRM, P.C.**
Post Office Box 667485
Houston, Texas 77266

F.B. Harvie, Jr.
**NOVELLI HARVIE & ASSOCIATES, PLLC**
12727 Featherwood, Drive Suite 110
Houston, Texas 77034

/s/ Garett A. Willig
Garett A. Willig

# TABLE OF CONTENTS

Cover Page…………………………………………………………  i
Certificate of Conference……………………………………….....  ii
Certificate of Service……………………………………………...  ii
Table of Contents…………………………………………………...  iii
Index of Authorities………………………………………………  iv
I.  Nature and Statement of Proceeding………………………........  1
II. Summary Judgment Evidence……………………………………..  2
III. Factual and Procedural Background…………………………….  2
IV. Statement of Issues to be Relied Upon……………………………  2
V. Summary of Argument…………………………………………  3
VII. Argument and Authorities……………………………………...  3
    A.  Plaintiff seeks to improperly amend his petition and assert a revised cause of action……………………………………  3
    B.  Plaintiff seeks to create a new cause of action…………………  6
    C.  Plaintiff's cited case law is inapplicable and easily differentiable ……………………………………………….  8
    D.  Advising customers of a known criminal issue is not an assumption of a duty and does not create abrogate existing law…………………………………………………....……  17
    E.  The duty Plaintiff seeks to establish sets a dangerous precedent……………………………………………..………  20
    F.  Plaintiff's "request" for a spoliation instruction is improper
VIII. Conclusions and Prayer…………………………………………  23

2875660v.1

# INDEX OF AUTHORITIES

## CASES

*Accord Crooks v. M1 Real Estate Partners, Ltd.*, 238 S.W.3d 474, 490 (Tex. App.—Dallas 2007, pet. denied)……………………………… 11

*Allen v. Wal-Mart Stores, LLC*, No. 17-20404 (5th Cir. Oct. 16, 2018)…………………………………………………… 11

*Bank of Tex. v. VR Elec., Inc.*, 276 S.W.3d 671, 683 (Tex. App.— Houston [1st Dist.] 2008, pet. denied)………………………………… 18

*Bolin v.* Tenneco, 373 S.W.3d 350, 365 (Tex. App.—Corpus Christi 1963, writ ref'd nre)……………………………………………… 11

*Colonial Savings Ass'n v. Taylor*, 544 S.W.2d 116 (Tex. 1976)………. 11

*Davis v. State*, No. 01-17-00587-CR, 2019 Tex. App. LEXIS 2067 (Tex. App.—Houston [1st Dist.] Mar. 14, 2019)……………………… 6

*Fox v. Dallas Hotel Co.*, 111 Tex. 461, 240 S.W. 517 (1922)…………. 8, 9

*Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)…………………………………………………………... 12, 15

*Holcombe v United States*, 383 F.3d 777 (W.D. Tex. 2019)…………... 13, 15, 16

*Ivey v. Phillips Petro Co.*, 36 F. Supp. 811 (S.D. Tex. 1942)..…………. 9

*Kristensen v. United States*, 372 F. Supp. 461 (W.D. Tex. 2019)……... 13, 14, 16

*McLennan v. American Eurocopter Corp.*, 245 F.3d 403, 432 (5th Cir. 2004)………………………………………………………... 11

*Moody Nat'l Bank v. Texas City Devel. Ltd.*, 46 S.W.3d 373 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)…………………………. 18, 19

*Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013)……………………. 12

*Osuna v. Southern Pac. Ry*, 641 S.W.2d 229 (Tex. 1982)……………... 10

iv

*Rick Furniture Co. v. Smith*, 202 S.W. 99 (Tex. Civ. App.—Dallas 1918)………………………………………………………………… 9

*Smith v. State*, No. 09-17-00081-CR, 2018 Tex. App. LEXIS 1874 (Tex. App.—Beaumont Mar. 14, 2018)………………………... 6

*The Torrington Co. v. Stutzman*¸46 S.W.3d 829 (Tex. 2000)………….. 11, 12

## **STATUTES**

Tex. Bus. & Com. Code §§ 3.101-.605 (negotiable instruments); §§ 4.101-.504 (bank deposits and collections) §§ 4A.101-.507 (funds transfers)……………………………………………………... 18, 19

**DEFENDANT BANK OF AMERICA, N.A.'S
REPLY BRIEF IN SUPPORT OF FIRST AMENDED MOTION FOR
SUMMARY JUDGMENT**

COMES NOW Defendant Bank of America, N.A., and pursuant to Federal Rule of Civil Procedure Rule 56, files this reply in support of its motion for summary judgment, and would show the Court as follows:

## I.
## NATURE AND STAGE OF PROCEEDING

1.      Despite Plaintiff's protestations to the contrary, this remains a premises liability case involving an undisputedly off-premises assault.  Plaintiff Clarence Mackey alleges that he visited a BANA Financial Center in Pearland, Brazoria County, Texas, and made a large cash withdrawal.  He left the BANA Financial Center, drove several miles away, and then was assaulted and robbed.  Plaintiff has now asserted claims of negligent provision of security at the BANA Financial Center, and seeks damages for lost funds, medical bills, mental anguish and punitive damages.

2.      BANA has moved for summary judgment on the grounds that: (1) BANA owed no duty to provide security services to Plaintiff off of BANA's premises and (2) Plaintiff's claim is barred by the applicable two year statute of limitations.

3.      This case is not currently set for trial.  Docket call was held on May 5, 2020, and trial will be set by the Court for the end of June / beginning of July, barring complications from the COVID-19 outbreak.

## II.
## SUMMARY JUDGMENT EVIDENCE

4.      BANA refers the Court to its summary judgment evidence, already on file.

## III.
## STATEMENT OF ISSUES TO BE RULED UPON

5.      BANA has moved for summary judgment on the grounds that: (1) BANA owed no duty to provide security services to Plaintiff off of BANA's premises and (2) Plaintiff's claim is barred by the applicable two year statute of limitations.  BANA also seeks a ruling on the duty, if any, owed to Plaintiff in regard to jugging incident, as it is crucial to the case and trial on the merits.

## IV.
## SUMMARY OF ARGUMENT

6.      BANA maintains that Plaintiff's injuries and damages occurred as the result of criminal actions of responsible third parties over whom BANA had no control. Plaintiff's negligence claim for failure to provide security against known criminal activity sounds in premises liability, the jurisprudence of which establishes that the duty owed to invitees extends only to incidents on the premises.  The unquestioned facts establish that Plaintiff's incident occurred approximately 14 miles away, in an area where BANA owes no duty to protect, prevent or deter criminal activity.  Finally, Plaintiff's counsel failed to use due diligence in serving Defendant with service of process within the statute of limitations of Plaintiff's claims, despite the fact that Plaintiff has had counsel for years prior to filing the instant lawsuit.

7.     In response to BANA's motion, Plaintiff improperly attempts to amend his petition to state that BANA assumed a duty to deter jugging, and that this assumption resulted in a negligent undertaking.  In doing so, Plaintiff completely fails to offer one case—*in any jurisdiction*—where a court has determined this particular assumption of duty and negligent undertaking has occurred, much less been breached.  Instead, Plaintiff improperly attempts to shoehorn completely differentiable and inapplicable law to fit the facts of the case at hand, in order to avoid summary judgment.  As BANA will show below, Plaintiff's efforts fall short and his attempt to establish a completely new cause of action and impossible duty of care for financial institutions—or any cash-based businesses—should be denied.

## VII.
## ARGUMENT AND AUTHORITIES

**A.     Plaintiff seeks to improperly amend his petition and assert a revised cause of action**

8.     In Plaintiff's Original Petition, which has never been amended since it was filed in the 239th Judicial District Court of Brazoria County, Texas, Plaintiff asserts nebulous causes of action for negligence per se and gross negligence related to alleged breaches by BANA of the Bank Protection Act.  Nowhere in the body of Plaintiff's pleadings is there any reference to BANA's alleged *assumption of a duty* to prevent or deter jugging incidents, as is now alleged in his response to BANA's Motion.  Further, in Plaintiff's Response to BANA's Motion, Plaintiff also seeks to revise his cause of action by stating he is only alleging that BANA failed to *deter* the jugging incident in question, not *prevent* it.  *See* Response, Para 4(a), p. 12: "Initially, it is not Plaintiff' position that

3

crime can be prevented – it can only be deterred." Finally, Plaintiff's Response seeks to refine his negligence per se claim into a negligent undertaking claim.

9.     These attempts are disingenuous.  First, what is meant by Plaintiff's claim of deterrence?  He gives literally no definition, but if deterrence is short of prevention (as Plaintiff admits it is) it would necessarily include instances where Plaintiff is assaulted anyway, regardless of the actions of BANA's employees.  No, Plaintiff clearly is not merely alleging that BANA failed to deter the jugging incident in question from happening. If this were truly the case, Plaintiff would have provided the testimony and/or report of a competent, qualified expert in the area of crime deterrence who would have opined on the mathematical probability of Plaintiff's incident occurring both with and without security officers on the premises.  This evidence would have been supported with factual data drawn from previous jugging incidents, as well as jugging incidents that were averted through the use of security.  Plaintiff has retained no such witness and provided no such evidence.

10.    However, Bennie Castro of BANA does provide insight on this issue:

| Q | 12 | (By Mr. Venzke) My question is a pretty |
|---|----|------------------------------------------|
|   | 13 | simple one. |
|   | 14 | Is it your testimony that no one -- that the |
|   | 15 | bank never considers the fact that in a jugging, the |
|   | 16 | money that's lost is the individual's and not |
|   | 17 | the bank's money? That never comes into their thought process? |
| A | 18 | No. |
| Q | 19 | And you're sure about that? |
| A | 20 | I've already -- I don't know what -- I'm sorry, |
|   | 21 | but maybe I'm not understanding your question. But |
|   | 22 | I've already explained that what -- what the bank |
|   | 23 | protection officers -- what we use them for is robbery |
|   | 24 | prevention. |
| Q | 25 | Sure. And not to prevent jugging? |

| | | |
|---|---|---|
| A | 1 | If that happens, then it happens. **I don't** |
| | 2 | **have any numbers to provide that -- to say that a bank** |
| | 3 | **protection officer will deter jugging. I have no** |
| | 4 | **numbers to -- and I don't think anybody can prove or** |
| | 5 | **provide numbers that would say putting a -- posting a** |
| | 6 | **guard, can prevent jugging.** |
| Q | 7 | Well, do you have numbers that say they |
| | 8 | prevent robberies? |
| A | 9 | **I don't think anybody does. That's the** |
| | 10 | **problem is that you can't determine -- somebody pulls** |
| | 11 | **into a parking lot and says I'm going to rob that Bank** |
| | 12 | **of America and once I pull in, I'm going to leave.** |
| | 13 | **Nobody can talk to that individual; and** |
| | 14 | **he can say, I was going to rob that but because they** |
| | 15 | **have a guard there, I'm not going to rob it anymore.** |
| | 16 | So there's no numbers. |
| Q | 17 | Same thing can be said about jugging. |
| A | 18 | **As I said that -- there's no numbers.** |

Deposition of Bennie Castro, 72:12-73:18(emphasis added).

In Mr. Castro's own words, the deterrence cannot be calculated. Yet, this deterrent effect (not prevention) is allegedly what BANA somehow failed to do.

10.    Despite Plaintiff's efforts to obfuscate, his claims are that BANA failed to *prevent* the jugging incident at issue. Without the jugging at hand, Plaintiff does not incur any alleged damages and this lawsuit is never filed. And as shown below, there is no recognize cause of action for failure to prevent a jugging incident in Texas or anywhere else. And there is good reason for this, as to do so would set an unreasonable, untenable and dangerous precedent.

**B.      Plaintiff Seeks to Create a New Cause of Action**

11.      The criminal act of jugging, as that term has become to be known, dates back to at least November of 1987.[1]  In fact, in July of 2014, the Houston Police Department issued a public notice on its website, warning of the phenomenon of jugging and tips to potentially avoid being a victim.[2]  While there is no statutory definition to the term "jugging," there is a common thread:

- "[R]obbers follow customers *from banks* and then rob them."  *Id.*(emphasis added);

- "[Jugging] "involves suspects who park in front of a bank, *watch customers leave the bank*, and then follow the customers in an attempt to commit a theft or robbery."  *Davis v. State,* No. 01-17-00587-CR, 2019 Tex. App. LEXIS 2067 (Tex. App.—Houston [1st Dist.] Mar. 14, 2019)(emphasis added);

- [Jugging is] a criminal scenario in which. . . multiple people will watch someone at a bank and when that person withdraws some money from a bank, *they'll follow the person to another location* to where they stop and get out of their car. Sometimes it's Wal-Mart or another [] store.  Once they see the person leave their vehicle, at that point they'll approach, they'll smash the window of the vehicle or unlock the car if someone happens to leave it unlock[ed] and they'll take -- they'll withdraw amounts.  *Smith v. State*, No. 09-17-00081-CR, 2018 Tex. App. LEXIS 1874 (Tex. App.—Beaumont Mar. 14, 2018)(emphasis added);

12.      The common theme to jugging events is that the perpetrators wait until the customers leave the premises and then follow and assault them.  As the criminal act of a jugging necessarily happens off the premises of the financial institution or business— exactly as what happened to the Plaintiff in this case—this type of criminal incident simply

---

[1] "In November of 1987, Officer John W. Clinton of the Houston Police Department was assigned to the Robbery Division investigating a certain type of robbery known as "jugging" whereby robbers follow customers from banks and then rob them."  *Brokenberry v. State*, 788 S.W.2d 103 (Tex. App.—Houston [14th Dist.] 1990).
[2] https://www.houstontx.gov/police/nr/2014/jul/nr070314-1.htm

cannot be prevented by premises owner. To take Plaintiff' argument at face value, the only way for BANA to completely prevent this particular incident from occurring was to (1) apprehend the man who entered the financial center, stood in the lobby and then left after Plaintiff left, or (2) hire employees to follow Plaintiff from the financial center in perpetuity and report to the police in the event he is jugged. Each of these purported duties is patently unreasonable and ridiculous. It is unquestioned fact that no criminal action was committed at the financial center in Pearland. Even if BANA's policy was to detain suspicious persons, which it is not, there was no suspicious activity observed or reported to BANA upon which it could act.

13.     It is patently unreasonable to expect a premises owner to assume the duty to prevent, or even deter jugging, a duty that it cannot hope to reasonably satisfy. National jurisprudence on this issue favors BANA: in his Response to BANA's Motion, Plaintiff cites to **exactly ZERO cases** in which a financial institution was found to have assumed the duty to prevent or even deter the crime of jugging. In fact, Plaintiff doesn't even cite a single case even referring to jugging. That is because—despite the phenomenon of "jugging" existing for over *30 years*—there is no Texas state case, no Texas federal case, and no Fifth Circuit case standing for this proposition. Further, there is no case anywhere in the country—regardless of state or jurisdiction—that undersigned counsel has been able to identify that stands for this proposition. If there were, that case would have been front and center of Plaintiff's argument in his Response. The lack of any court in this country applying the standard Plaintiff now seeks this Court to apply is ample evidence that the standard is patently unreasonable.

**C.      Plaintiff's cited case law is inapplicable and easily differentiable**

14.      In his Response, Plaintiff attempts to avoid the applicable elements of premises liability by citing to established law on the issues of assumption of duties and negligent undertaking.  BANA does not dispute that Texas law permits the cause of action of negligent undertaking and permits the assumption of legal duties.  BANA does take issue with Plaintiff improperly attempting to amend his claims in this case via his summary judgment briefings.  BANA also contends, as shown below, that the cases cited by Plaintiff are factually and legally distinct from the issue at hand.  Generally, the assumed duties to which Plaintiff cites generally deal with conditions or actions occurring on the premises owned or controlled by the defendant, duties which the defendant is the sole or best-positioned entity to carry out, and do not involve requirements to prevent or deter crime (a situation which is out of the control of the premises owner.)  In short, these defendants could possibly have met the duties they assumed by reasonable means; BANA could never reasonably do so with the duty to which Plaintiff hopes to hold it.

15.      Plaintiff first cites to *Fox v. Dallas Hotel Co.*, in which a hotel night watchman was killed as the result of an elevator that was not properly maintained by the Dallas Hotel Company, which operated and maintained the Adolphus Hotel in Dallas.  111 Tex. 461, 240 S.W. 517 (1922).  While this claim pre-dates modern premises liability law, the Court found that the Dallas Hotel Company assumed a duty from the building owner to maintain the elevators in working order.  *Id.* at *4-6.  The specific duty at issue is the maintenance of elevators, which are necessarily located on the premises and over which the Dallas Hotel Company exercised complete right to control.  *Id.* at *8-9.  Further, it is

not unreasonable for the Dallas Hotel Company to be expected to be able to maintain an elevator on its own grounds. The accepted duty was well within company's ability to satisfy, and there was no external, criminal third party with which the company had to contend or account for in fulfilling this duty. This is completely different from the current cause, where the assault in question occurred 14 miles from the premises, there was no criminal activity on the premises, and thus nothing to prevent or deter.

16.     Plaintiff then relies upon *Rick Furniture Co. v. Smith*, 202 S.W. 99 (Tex. Civ. App.—Dallas 1918). In this case, a furniture store installed a swing purchased by the plaintiff on the plaintiff's front porch. *Id.* at 99-100. The swing was installed negligently and broke, causing the plaintiff to fall. *Id.* In this case, the court found that the installer was invited on to the premises of the Plaintiff for his benefit and assumed a duty to install the swing, a duty over which it had total control. *See id.* at 100-101. Again, the accepted duty was well within company's ability to satisfy, and there was no external, criminal third party with which the company had to contend or account for in fulfilling this duty. This case is completely different from the current cause, where the assault in question occurred at a location 14 miles away over which Defendant has absolutely no right to control.

17.     Plaintiff then relies upon *Ivey v. Phillips Petro Co.*, 36 F. Supp. 811 (S.D. Tex. 1942). In this case, a landowner brought suit against an oil company (Phillips) for failure to bring a blowout well under control. *Id.* at 812-14. Phillips owned an oil and gas lease with four producing wells on plaintiff's 500 acre farm. *Id.* One of the wells developed a blowout, releasing oil onto the surface, and Phillips was unable to control or

stop the blowout before damage was sustained to the land. *Id.* The Court found that Phillips undertook a duty to kill the well, which it breached. *Id.* at 818-20.

18.     Again, Plaintiff cites a case before modern premises liability, and the duty here is markedly different than the present case. Phillips executed an oil and gas lease, had implicit permission to enter the premises for the purpose of developing oil and gas wells, and had complete control over the operation of the oil wells located on the premises. *See id.* at 812-814. The accepted duty of shutting down a blowout well was well within a reasonable oil exploration's company's ability to satisfy. While Phillips had to contend with Mother Nature, there was no criminal third party with which Phillips had to contend or account for in fulfilling this duty. This case is completely different from the current cause, where the assault in question occurred at a location 14 miles away over which Defendant has absolutely no right to control.

19.     Plaintiff then relies upon *Osuna v. Southern Pac. Ry*, 641 S.W.2d 229 (Tex. 1982). In this case, a fatality accident between a train and a passenger car was alleged to have been caused by a faulty warning light placed at the intersection by the defendant, Southern Pacific Railway. *Id.* at 229-30. Because the defendant affirmatively placed the light at the intersection of the train tracks and the road upon which plaintiff was driving, the court found the railroad company assumed a duty to keep the light in good repair. *Id.*

20.     The duty assumed by the defendant involved maintaining what amounted to defect on a premises over which it had complete control. Again, the accepted duty of maintaining a light was well within a reasonable railroad company's ability to satisfy. There was no criminal third party with which the railroad company had to contend or

account for in fulfilling this duty.  Once again, this case is completely different from the current cause, where the assault in question occurred at a location 14 miles away over which BANA has absolutely no right to control.

21.     Plaintiff then relies upon *Colonial Savings Ass'n v. Taylor*, 544 S.W.2d 116 (Tex. 1976).  In this case, plaintiff purchased property, which included two houses, and sought to have it insured by Colonial Savings Association.  *Id.* at 117-19.  Colonial confirmed the policy, but was unaware that the property contained two houses and not one. *Id.*  A fire occurred and the house that was damaged was not covered.  *Id.*  While plaintiff was negligent for not disclosing the two houses, the appellate court also found that Colonial assumed to duty to insure the property.  *Id.*

22.     The specific duty at issue was the issuance of an insurance policy, not even a condition or activity of any kind on the premises.  *Id.*  Nonetheless, the decision of whether not to insure a property is a decision over which Colonial had complete control. This is completely different from the current cause, in that the duty assumed can be completely and reasonably carried out by Colonial, and there was no criminal third party with which it had to contend or account for in fulfilling this duty.

23.     Plaintiff cites *The Torrington Co. v. Stutzman*, 46 S.W.3d 829 (Tex. 2000), *Accord Crooks v. M1 Real Estate Partners, Ltd.*, 238 S.W.3d 474, 490 (Tex. App.—Dallas 2007, pet. denied); *Bolin v.* Tenneco, 373 S.W.3d 350, 365 (Tex. App.—Corpus Christi 1963, writ ref'd nre); *McLennan v. American Eurocopter Corp.*, 245 F.3d 403, 432 (5th Cir. 2004) and *Allen v. Wal-Mart Stores, LLC*, No. 17-20404 (5th Cir. Oct. 16, 2018), seemingly to support the mere facts that Texas cases have supported the negligent undertaking theory

and that the duty to use reasonable care can arise when a person undertakes to provide services for another, either gratuitously or with compensation." *See generally, supra.*

24.     BANA would note that *Torrington* is neither a premises defect nor a negligent activity liability case. It is a products liability case brought in connection with a helicopter crash in which two marines died. *See Torrington Co.*, 46 S.W.3d at 832. The issue was whether the defendant ball-bearing manufacturer had undertaken a duty to investigate and identify defective bearings. *Id.* at 837-38. The case was submitted to the jury on a broad-form negligence liability question as to the defendant's breach of that duty, without a predicate question as to whether it had undertaken such a duty. *See id.*

25.     BANA acknowledges that *Torrington* discusses the "Good Samaritan doctrine, or negligent undertaking," as established in Texas law, which generally imposes no duty to act in preventing harm to others. *Torrington*, 46 S.W.3d at 837 (Tex. 2000). Even so, a duty to use reasonable care may arise "when a person undertakes to provide services to another, either gratuitously or for compensation."  However, that is not the end of the analysis.  In deciding the duty element of a negligent undertaking theory, courts must ask whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist.  *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) (per curiam), considering "several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant," *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

26.     Plaintiff then incredibly attempts to rely upon *Kristensen v. United States*, 372 F. Supp. 461 (W.D. Tex. 2019) and *Holcombe v United States*, 383 F.3d 777 (W.D. Tex. 2019).  In *Kristensen*, Atase Giffa notoriously shot five people and killed three on the grounds of Fort Hood.  372 F. Supp. at 463-64.  He allegedly assaulted his wife in their off-base residence in the days before the incident and she reported it to his commanding officer.  *Id.*  Her survivors brought suit against the United States on the basis that it failed in its undertaking to protect the wife and her neighbors as violation of specific and written Army and Department of Defense regulations.  *Id.*

27.     *Kristensen* in markedly different than the present case.  In *Kristensen*, the court found that there was a fact issue as to whether or not the Army assumed the duties of local law enforcement with regard to the conduct of off-base officers at Fort Hood, and that such an assumption creates an independent duty to civilian third parties.  *Id.* at 468-69.  As the incident occurred off-base, the local police department, Killeen PD ("KPD") would be the organization called to protect Dawn Larson Giffa and her neighbors.  *Id.*  However, KPD explicitly refused to exercise jurisdiction over the domestic violence incident that predated the murder of Dawn Larson Giffa and her neighbors due to SPC Giffa's status as a member of the Army.  *Id.*

28.     Moreover, Army Regulation ("AR") 608-18 required a Memorandum of Agreement ("MOA") between "Army installations and adjoining local communities" in order to address "problems of spouse and child abuse within military [f]amilies." AR 608-18, 2-12. *Id.*  It was found that such an MOA between Fort Hood and KPD, and between Fort Hood and the Bell County District Attorney's existed at the time of the assault.  *Id.*

The Court found that in a case where the local police department refuses to exercise jurisdiction over an individual because of his military ties, but there is an explicit MOA between the local police department and the military, military law enforcement has to adopt the posture of local law enforcement. *Id.*

29.    In the present case, and unlike *Kristensen*, there is no specific policy or procedure or documentation from BANA specifically stating or even purporting to assume any duty related to jugging. Even the BANA documents upon which Plaintiff relies simply attempt to notify customers about a known and potential criminal issue and how to modify *their* behavior. Further, there is no evidence at all that BANA attempts to supplant law enforcement's duties in any way. In fact, BANA's corporate representative confirms the opposite:

| Q | 3 | Tell me the people at the bank who have |
| | 4 | security responsibilities. |
| | … | |
| A | 13 | We train our associates -- we train them |
| | 14 | annually for robbery. So they know what to do once a |
| | 15 | robbery occurs and what steps they have to follow. We |
| | 16 | do not encourage our associates to try to prevent any |
| | 17 | type of robbery or any type of crime that goes on in our |
| | 18 | financial centers. We strictly prohibit that. |

Deposition of Benny Castro, 31:3-4, 31:13-18.

30.    Further, the duty owed by the Army to Dawn Giffa was rooted in the Army's prior knowledge of Atase Giffa's previous assault. In this case, BANA had no prior knowledge of the criminal background of the currently unknown and un-apprehended assailants of Plaintiff. Further, the previous incidents BANA have identified to Plaintiff do not identify a single jugging incident occurring before Plaintiff's incident. As such, it

is patently unreasonable that BANA be expected to warn Plaintiff of a potential jugging incident by these persons who are completely unknown to the bank. Finally, BANA points out that the citation referred to by Plaintiff is for a summary judgment denial, and does not affirmatively establish the duty alleged by the underlying plaintiff.

31. In *Holcombe*, mass shooter Devin Patrick killed 26 members of a church in Sutherland Springs, Texas. 383 F.3d 777, 778-80 (W.D. Tex. 2019). Patrick had a history of mental illness while he served in the United States Air Force (under the auspice of the Department of Defense). *Id.* The underlying survivor plaintiffs alleged that this history of behavior was not reported by the U.S. Air Force and the Department of Defense to the National Instant Criminal Background Check administered by the Federal Bureau of Investigation. *Id.* Plaintiffs allege that this failure to report information to the NICS was the reason Patrick was allowed to purchase the weapons he used. Id. at 780-782.

32. In deciding the duty element of a negligent undertaking theory, the *Holcombe* court asked whether the United States acted in a way that requires the imposition of a duty where one otherwise would not exist, applied the Phillips factors of "risk, foreseeability, and likelihood of injury weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant," *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

33. In determining if a duty arose, the Court found that the risk, foreseeability, and likelihood of injury were high, as gun violence generally and mass shootings specifically are tragically commonplace. "Congress has disqualified certain people from

buying, owning, or possessing guns and established a national background check system to prevent these people from obtaining guns. *Id.* With [Patrick] specifically, at every stage in his life—during and after his USAF tenure—the threat of violence loomed." *Id.* Further, the "social utility of USAF's and DOD's conduct is high, but the magnitude of guarding against the injury and the consequences of placing this burden on the United States are low." The United States, of all possible entities, *is best positioned* to carry out the NICS system effectively and has the resources to absorb the blow when, as here, it allegedly acts negligently and faces the prospect of damages for that negligence." *Id.*

34.     The present case is markedly different. First, like in *Kristensen,* BANA is not the far-reaching and powerful government of the United States of America, and should not be held to the same standards as a result. *Holcombe* involved the failure of two governmental entities (USAF and DoD) to report the <u>previously documented and known problematic and criminal behavior</u> of their former serviceman to another governmental entity (FBI). This failure to share specific knowledge on Patrick to the FBI, who singlehandedly administered the nationwide NICS program, allegedly led to the foreseeable shooting in Sutherland Springs.

35.     The present case involves what is to be reasonably expected by BANA in an alleged duty to prevent or deter a criminal assault that happened 14 miles from BANA's premises, allegedly carried out by two men whose identities are unknown to this day. In regard to foreseeability, there was no criminal activity on the premises for BANA to deter or prevent. Further, there had not been a documented instance of jugging related to this financial center until Plaintiff's incident. The magnitude of guarding against this type of

criminal activity and the consequence of placing the burden on BANA are both excessive; as previously discussed BANA would have to interrogate and detain customers on its premises and/or follow each and every one of its customers indefinitely from the premises to ensure they are not later jugged. Finally, unlike the United States government, BANA is not best-positioned to deter and prevent crime, on or off its premises: that would be the role of local law enforcement.

36.     As seen above, none of the cases cited by Plaintiff are on point or stand for the proposition that a financial center can assume a duty to prevent jugging just because they are aware of it happening. Each either: (1) dealt with a defect or condition of the premises over which the underlying defendant had access and control and it was within the defendants ability to satisfy the duty, or (2) dealt with a governmental failure to act upon specific background information regarding persons who would go on to commit heinous crimes. BANA falls into neither of these camps, and thus Plaintiff has failed to establish that there is a duty owed by BANA to Plaintiff to prevent, or even deter, jugging.

**D.      Advising customers of a known criminal issue is not an assumption of a duty and does not create abrogate existing law**

37.     Following the filing of his Response to BANA's summary judgment, it now seems that Plaintiff's allegation is that BANA assumed a duty to prevent jugging incidents, based his claim partly on the fact that BANA has produced internal literature regarding jugging activity that it attempts to share with its customers. Plaintiff alleges that the failure of BANA to advise Plaintiff of jugging is a breach of this duty, and creates a cause of action for negligent undertaking. BANA asserts that sharing knowledge of a criminal activity

known to a defendant, but over which Defendant has no legal duty to prevent or deter, does not assume a duty, nor does it abrogate existing law in regard to negligence claims.

38. The most similar example to this situation is that of bank liability for fraudulent wire transfers. Fraudulent wire transfers occur when criminal third parties gain access to communications or information of a bank customer (through hacked email servers, e.g.) and induce the customer to unwittingly make a wire transfer to the criminals. *See e.g. Moody Nat'l Bank v. Texas City Devel. Ltd.*, 46 S.W.3d 373 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). This is a known issue, and BANA advises of its existence and steps that can be taken to potentially avoid being a victim via its public website.[3] However, advising of the existence of fraudulent wire transfers does not equate to an assumption of the duty to stop or deter them, as there is concrete law in place governing that issue.

39. Under Texas law, the Uniform Commercial Code regulates a bank's relationship with its Texas customers, as well as its handling of funds transfers. *See generally* Tex. Bus. & Com. Code §§ 3.101-.605 (negotiable instruments); id. §§ 4.101-.504 (bank deposits and collections), id. §§ 4A.101-.507 (funds transfers); *Bank of Tex. v. VR Elec., Inc*., 276 S.W.3d 671, 683 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). Texas UCC Article 4A is the exclusive remedy for a plaintiff's claims in the case of fraudulent wire transfers, and **all other claims** are precluded and/or preempted as a matter of law. In *Moody National Bank*, the court held that common law negligence claims were

---

[3] https://www.bankofamerica.com/security-center/faq/data-compromise/

preempted when plaintiff brought claims against defendant bank concerning a wire transfer. *See Moody Nat'l Bank v. Texas City Devel. Ltd.*, 46 S.W.3d 373 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). The *Moody* court reasoned that "[c]ommon law claims are precluded when a claim would impose liability inconsistent with any of [Article 4A's] provisions." *See id*. at 378. In support of its reasoning, the *Moody* court reviewed Texas and Business Code § 4A.102. This section states, "except as otherwise provided in § 4A.108, this chapter applies to funds transfers defined in § 4A.104." As part of the official comment to § 4A.102, the comment states as follows:

> The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

See Tex. Bus. & Comm. Code § 4A.102 (UCC comment).

40.     BANA asserts that the current jurisprudence regarding wire fraud cases is analogous to the situation at hand. Both involve the Bank attempting to notify its customers (and the public at large) about known criminal activity (wire fraud and jugging). In both instances, BANA does not specifically assume the duty to prevent or deter these types of crimes, as the information shared in both events are practices for the customers themselves to avoid becoming a victim. Further, in both cases there exists an established and recognized cause of action for plaintiff's alleging damages—premises liability and it requisite elements and UCC Article 4A actions that subsume any common law claims, and NOT general negligence or negligent undertaking.

**E.** **The duty Plaintiff seeks to establish sets a dangerous precedent**

41.     Plaintiff's claim arises from BANA's alleged failure to stop the jugging incident that occurred 14 miles from its premises.  How BANA specifically failed to do this or what Plaintiff thinks BANA should have done to definitively prevent this has never been clearly articulated by the Plaintiff.  Plaintiff's nebulous claims that more security may have deterred this incident from happening are nothing more than presumption and conjecture and are not summary judgment evidence.  But more concerning is the precedent that may be set should the duty Plaintiff seeks be established.

42.     The duty that Plaintiff seeks to impose on BANA stems from BANA's mere knowledge that jugging, as a criminal activity, exists at all.  "These two Bank documents and the testimony of its designated witness prove that the Bank was aware of jugging, was aware it involved crimes that were completed off its premises…"  Plaintiff's Response, p. 14.  Yet, jugging is public knowledge; even the Houston Police Department has an online press release dating back to 2012.  Plaintiff himself was the subject of a KPRC news report.  So what is BANA—or literally any other business that may deal in cash—to do with this knowledge?

43.     Under Plaintiff's standard, just by possessing knowledge of jugging as a criminal phenomenon puts BANA in an unwinnable situation.  They can either: (1) ignore that jugging occurs, and not inform customers about it because it cannot be deterred or prevented by the bank, or (2) utilize training to try and discuss with their customers what *the customers can do* to prevent jugging, as it cannot be deterred or prevented by the bank.  Either course of conduct would result in the present lawsuit from Plaintiff.

44. Plaintiff's expected response would be for BANA to hire security personnel. However, the testimony of Bennie Castro, *supra*, states that no BANA personnel are to approach or try and stop a crime in progress on the premises. Further, security guards are not a guarantee that even on on-premises crime like robbery will be prevented or deterred, much less an off-premises crime like jugging:

| | | |
|---|---|---|
| Q | 19 | So is it your testimony that if a police |
| | 20 | officer -- if one of these security guards is outside in |
| | 21 | the parking lot and he doesn't go in and he suspects |
| | 22 | this guy and he doesn't rob the bank and he leaves, that |
| | 23 | that it is not a deterrence to anyone who may be a |
| | 24 | jugger? Is that your testimony? |
| A | 25 | I'm not saying anyone. I'm saying that it's a |
| | | |
| | 1 | deterrent to those who believe it's a deterrent. I |
| | 2 | can't say it's a deterrent to everybody. Because we've |
| | 3 | had financial centers that have been robbed with a |
| | 4 | security guard there. |
| Q | 5 | I -- I'm not -- |
| A | 6 | And so for you to -- for me to say that |
| | 7 | posting a guard is going to prevent jugging, I just |
| | 8 | can't say that. |

Deposition of Bennie Castro, 24:19-25:8.

45. Further, where is the line to be drawn? In the present case, Plaintiff drove from BANA's location to the Brookside Equipment Sales location, where he was assaulted. What if he was followed as he stopped at a business that may dispense cash as a part of its regular business (a grocery store, drug store or even a law firm) before finally reaching Brookside Equipment? Would that business have assumed the duty to also stop the jugging incident that did not occur on their property? What about the locations that Plaintiff visited before the BANA financial center? Do they share the same burden? Under Plaintiff's

theory, they would, as each of them should be on notice of the publicly available information regarding jugging (and if they are not, they should be). The Plaintiff should not be allowed to create such a slippery slope when it comes to the liability of premises owner.

**F.    Plaintiff's "request" for spoliation is improper**

46.    In his Response, Plaintiff asserts that BANA spoliated evidence in that it does not retain full copies of incident reports longer than six months (per its corporate policy). Plaintiff then states that because BANA was able to produce the incident report for the Plaintiff's particular assault on July 26, 2019, that in doing so it: (1) is a miracle and (2) is evidence that BANA has been "less than candid in its representations to the Court." Plaintiff's Response, p. 18. Plaintiff then goes on to request a spoliation instruction.

47.    Plaintiff's reckless and unfounded accusations of BANA's impropriety to the Court aside, a request for a spoliation instruction is the subject of its own motion and is not germane to a response to a motion for summary judgment. Further, Plaintiff's present request for a spoliation instruction fails to comply with Judge Hanks' Local Procedure 6E, as it is a contested issue and there was no conference or certificate of conference regarding same. BANA requests that Plaintiff' request be stricken for failure to follow local procedures.

48.    As will be addressed in response to any subsequent motion asking for a spoliation instruction, Plaintiff's incident occurred on or about July 25, 2016.[4]  Plaintiff

---

[4] In his Response, Plaintiff erroneously asserts that his own incident occurred on July 26, 2019.  It did not.

then claims that BANA's policy would be to destroy records by January 26, 2016. This would be difficult to do, as Plaintiff's incident had not yet occurred. BANA is forced to assume Plaintiff meant to say January 26, 2017. BANA was served with Plaintiff's Original Petition seeking pre-suit discovery on September 6, 2016, *which is less than six months later* **and** *before January 26, 2017.* Thus, Plaintiff's incident report was preserved for future potential use in litigation. Further, by the time that: (1) Plaintiff elected to stop wasting nearly two years in pre-suit discovery and file his original petition asserting his actual claims, and (2) Plaintiff's counsel sent discovery asking about OTHER prior incidents, the six-month post-incident retention policy has long expired. Thus, BANA was completely forthcoming and not "less than candid" in its representations to the Court, and a spoliation instruction is unwarranted.

## CONCLUSION

Based on the foregoing arguments, Defendant Bank of America, N.A. requests that the Court determine that it owed no duty to Plaintiff to prevent, or even deter, his assault which occurred 14 miles away. Defendant requests that its motion for summary judgment be granted, that Plaintiff's claims against BANA be dismissed with prejudice as to refiling and for all other relief, at law or in equity, to which Defendant may be justly entitled